STATE OF NORTH CAROLINA v. MARGIE BULLARD BARFIELD

No. 12

(Filed 6 November 1979)

1. **Constitutional Law § 40— indigent defendant—appointment of only one attorney sufficient**

The trial court did not err in denying the indigent defendant's motion for the appointment of additional counsel to represent her in a first degree murder case since the burden placed upon defense counsel was not excessive, and the attorney appointed by the court was competent to represent the best interests of defendant.

2. **Criminal Law § 15.1— venue—change because of pretrial publicity and number of jailed defendants—no abuse of discretion**

The trial court did not err in denying defendant's motion for change of venue to the western part of the State, nor did it err in moving the case from Scotland County to Bladen County for trial, since the court acted within its discretion in moving the case; no abuse of discretion was shown; the court had to consider the rights of twenty jailed persons awaiting trial in Scotland County and therefore properly moved the case to Bladen County; and though a radio station in Lumberton as well as newspapers in Robeson County and surrounding counties gave coverage to the pending trial, there was nothing which suggested that the coverage was anything more than general in nature and likely to be found in any jurisdiction to which the trial might be removed.

3. **Criminal Law § 91.3— witness absent due to illness—deposition taken—continuance properly denied**

The trial court did not err in denying defendant's motion for continuance based upon the absence of a witness where the witness was hospitalized and was not expected to be available at trial, and the testimony of the witness was in fact obtained and presented before the jury by way of deposition.

4. **Jury § 6— individual voir dire denied—no abuse of court's discretion**

Defendant failed to show an abuse of the trial court's discretion in its refusal to grant her motion for an individual voir dire of each juror and sequestration of the jurors during voir dire.

5. **Jury § 7.11— attitudes toward death penalty—challenge for cause proper**

A prospective juror is properly excused for cause when his answers on voir dire concerning his attitudes toward the death penalty, although equivocal, show when considered contextually that regardless of the evidence he would not vote to convict the defendant if conviction meant the imposition of the death penalty; three jurors in this case who indicated that, no matter what aggravating circumstances were established by the evidence, they could not vote to impose a death sentence were properly excused for cause.

State v. Barfield

**6. Criminal Law § 34.4— evidence of other offenses committed by defendant — admissibility to show intent, motive, common scheme or plan**

In a prosecution of defendant for poisoning the man with whom she lived, the trial court did not err in admitting evidence concerning defendant's poisoning of four other individuals and defendant's forging and uttering forged checks, since such evidence was admissible to show (1) that defendant knew the probable consequences of her actions when she administered the poison to her fifth victim; (2) specific intent on defendant's part in that she had a pattern of administering poison to persons, knowing full well the probable consequences of her actions; (3) a motive for the crime in that defendant poisoned the individuals, with one exception, only after the forgeries were discovered or she became fearful of discovery; and (4) that a continuing plan or scheme existed whereby defendant used the proceeds of her forgeries to support her drug addiction, and then murdered her victims when the forgeries were discovered or she feared discovery.

**7. Criminal Law § 102.5— prosecutor's conduct in examining witnesses—no prejudice**

There was no merit to defendant's contention that the district attorney presented the case for the State in such a way that he was guilty of prosecutorial misconduct since the district attorney could properly ask a witness to complete his account of the condition of the homicide victim before he died by asking the witness to demonstrate the victim's scream; though the district attorney improperly asked the opinion of a witness who had not been properly qualified and offered as an expert, defendant was not prejudiced because the witness was not permitted to answer; the district attorney could properly pursue a line of questioning which tended to show that the victim carried large sums of money in his wallet, as this evidence was relevant to show motive; the district attorney could repeatedly attempt to elicit certain information from the daughter of defendant's deceased husband, as there was nothing in the record to indicate that he was badgering the witness or that his questions were not asked in good faith; the district attorney could properly ask defendant if she had poisoned another person; and defendant was not prejudiced by the district attorney's question as to why she poisoned a named person, even if the question was improper, since the court sustained defense counsel's objection as to form.

**8. Homicide § 20— murder by poisoning—evidence of other forgeries and poisonings—rat poison bottle—forged checks—admissibility**

In a prosecution of defendant for poisoning the man with whom she lived where there was also evidence that she had poisoned four other people and forged checks, the trial court did not err in admitting into evidence an empty bottle bearing the label "Singletary's Rat Poison" found by a police officer behind the house of one victim, though the bottle had been in the field over a year when found, since the label was still legible; the bottle was found in the spot where defendant said she had thrown it; and the officer stated that he had kept the bottle in his sole possession from the time he recovered it to the time of the trial. Furthermore, the court did not err in receiving into evidence the various checks which defendant allegedly forged, since a proper foundation

State v. Barfield

was laid by testimony of witnesses who were familiar with the handwriting of the victims and by testimony of a handwriting expert.

**9. Homicide § 15.5— cause of death—opinion evidence admissible**

In a prosecution of defendant for first degree murder by poisoning, the trial court did not err in permitting three pathologists to state their opinions as to cause of death and to state that such opinions were based on an autopsy performed on the victim.

**10. Criminal Law § 75.6— statements to police officers—Miranda warnings given—sufficiency**

The trial court did not err in denying defendant's motion to suppress statements given by defendant to police officers since the evidence on voir dire tended to show that defendant was given the *Miranda* warnings, did not seem to be under the influence of anything, and was not promised any leniency if she confessed. Furthermore, the fact that defendant was not given *Miranda* warnings immediately preceding each of four statements on the second day she was questioned did not render the statements inadmissible, since defendant was warned of her constitutional rights before she made any statements; defendant made four separate statements in the space of a relatively short time; the interrogation took place in the same location where she was given her Miranda warnings; the interrogation was conducted by the same officers who advised her of her constitutional rights; and there was no evidence that defendant was under the influence of any substance at the time she made the statements. ·

**11. Criminal Law § 112.6— jury instructions—insanity—insufficient evidence to require instruction**

The test of insanity that is recognized in N. C. is whether the accused at the time of the commission of the alleged act was laboring under such defect of reason from disease or defect of the mind as to be incapable of knowing the nature and quality of the act or, if he does know this, was by reason of such defect of reason incapable of distinguishing right from wrong in relation to such act; therefore, the trial court did not err in failing to submit the defense of insanity to the jury in this homicide prosecution where all three psychiatrists who testified concluded that defendant knew the difference between right and wrong, and there was no evidence that she did not know the nature and quality of her acts.

**12. Homicide § 21.6— murder by poisoning—sufficiency of evidence**

In a prosecution of defendant for the first degree murder of the man with whom she lived, evidence was sufficient to be submitted to the jury where it tended to show that defendant was addicted to drugs; she forged checks in order to obtain money to support her habit; when deceased discovered the forgeries, he threatened to report them to police; and defendant then obtained ant poison which she placed in deceased's drinks.

**13. Constitutional Law § 80; Homicide § 31.3— death penalty—no cruel and unusual punishment**

The death penalty for first degree murder is not cruel and unusual punishment within the meaning of the Eighth Amendment, since it is neither the pur-

poseless imposition of severe punishment nor a punishment grossly dispropor-
tionate to the severity of the crime.

**14. Constitutional Law § 80; Homicide § 31.3— death penalty not mandatory**

The N. C. death penalty statutes, G.S. 15A-2000 *et seq.*, are not man-
datory in nature and therefore unconstitutional since they provide for the ex-
ercise of guided discretion in the imposition of sentence.

**15. Constitutional Law § 80; Homicide § 31.3— death penalty — statutes sufficient-
ly specific**

There is no merit to defendant's contention that the N. C. death penalty
statutes are unconstitutional because they fail to give the jury objective stand-
ards to guide it in weighing aggravating against mitigating circumstances in
passing upon the issue of sentence and that the aggravating circumstances are
vague and without accurate definition, since the issues which are posed to a
jury at the sentencing phase of N. C.'s bifurcated proceeding have a common
sense meaning, and jurors who are sitting in a criminal trial ought to be
capable of understanding them when they are given appropriate instructions
by the trial judge.

**16. Constitutional Law § 80; Homicide § 31.3— death penalty — burden of disprov-
ing mitigating circumstances not on State**

There is no merit to defendant's contention that the N. C. death penalty
statutes are unconstitutional because the State ought to be required to prove
that there are no mitigating circumstances before the death penalty may be
imposed, since due process does not require a state to disprove beyond a
reasonable doubt the existence of a factor which mitigates the degree of
criminality or punishment.

Justice BROCK took no part in the consideration or decision of this case.

APPEAL by defendant from *McKinnon, J.,* 27 November 1978
Special Criminal Session, BLADEN Superior Court.

Upon pleas of not guilty and not guilty by reason of insanity,
defendant was tried on a bill of indictment which charged her
with the murder of Stewart Taylor. The trial was conducted in
the bifurcated manner mandated by G.S. § 15A-2000 *et seq.*
Phase one of the trial determined the guilt or innocence of de-
fendant. Phase two of the trial was held to decide her sentence
for first-degree murder following her conviction on that charge.

During the guilt determination phase of the trial, the State
introduced evidence summarized in pertinent part as follows:

Prior to January 1978, defendant and Stewart Taylor had
been going together. On occasion, defendant stayed with Taylor
at his home in St. Pauls, North Carolina. At the time of his

death, Taylor was fifty-six years old. He had been in fairly good health until the evening of 31 January 1978, four days before his death. On that evening, defendant and Taylor went to Fayetteville to attend a gospel sing. While at the performance, Taylor became ill. The couple left and returned to St. Pauls. At approximately 2:30 the following morning, Taylor began vomiting and having diarrhea. He continued to be ill throughout the day.

On the next day defendant took Taylor to Southeastern General Hospital in Lumberton where he was treated. At the time he was examined by an emergency room physician, Taylor was complaining of nausea, vomiting and diarrhea, as well as general pain in his muscles, chest and abdomen. His blood pressure was low. His pulse was weak and rapid. He was dehydrated and his skin was ashen in color. After receiving intravenous fluids and vitamins, as well as other treatment, Taylor was released from the hospital and defendant took him back to his home in St. Pauls where she fed him.

The next day, 3 February 1978, an ambulance was summoned to Taylor's home. The attendants found him to be in great pain. His blood pressure was very low, his breathing was rapid, and his skin was gray. During the trip to the hospital, Taylor was restless and moaning. While he was in the emergency room, he was given intravenous fluids. A tracheotomy was performed but he died in the emergency room approximately one hour after he was brought in. One of the attending physicians, Dr. Richard Jordan, was "not satisfied" as to the precise cause of death. After talking with two of the attending physicians, members of Taylor's family requested that an autopsy be performed.

The autopsy was performed by Dr. Bob Andrews, a pathologist. During the course of the autopsy, toxicological screenings were performed on samples of Taylor's liver and blood. Though the normal human body contains no arsenic in the blood or in the liver tissue, Taylor's blood was found to have an arsenic level of .13 milligrams percent. His liver had an arsenic level of one milligram percent. These findings led Dr. Andrews to conclude that Taylor died from acute arsenic poisoning.

On 10 March 1978, Robeson County Deputy Sheriffs Wilbur Lovette and Al Parnell talked with defendant at the Sheriff's Department in Lumberton. After having been given her *Miranda*

warnings, defendant executed a written waiver indicating that she understood what her rights were and that she was willing to make a statement as well as answer questions without the presence of an attorney. The conversation between defendant and the deputies related to a number of checks that had been forged on the account of Stewart Taylor. During the interview, the officers produced a check dated 31 January 1978 in the amount of $300.00. Defendant stated that she had seen the check before; that she had cashed the check; and that while she had "filled out" the check it was signed by Taylor himself. While she talked with the officers, defendant produced two checks from her pocketbook which were dated 4 November 1977 and 23 November 1977. Both checks were drawn on Taylor's checking account and were payable to her. They were in the amounts of $100.00 and $95.00, respectively.

The State introduced evidence obtained through handwriting analysis which tended to show that the three checks were not written by Stewart Taylor; and that the checks had been cashed by defendant at a branch of First Union National Bank in Lumberton. During the interview with the deputies, defendant denied that she had forged any checks on Taylor's account.

Defendant was asked by the officers if she knew the cause of Taylor's death. Upon being told that the autopsy had indicated that arsenic poisoning was the cause of Taylor's death, defendant began crying, stating that "You all think I put poison in his food." She then proceeded to deny that she was in any way involved with Taylor's death. After making that denial, defendant was taken home. The investigation continued through the weekend.

On Monday, 13 March 1978, defendant returned to the sheriff's department accompanied by her son, Ronald Burke. After she was again advised of her constitutional rights, she executed another written waiver. She then made a lengthy statement in the presence of Deputies Lovette and Parnell.

In her statement, she admitted that before 1 January 1978 she had forged some checks on Taylor's account which he found out about when his bank statements came in the mail; that upon finding out about the forgeries, Taylor talked with her and threatened to "turn her in" to the authorities; that she forged another check on Taylor's account on 31 January 1978; that the

forgery bothered her because Taylor would find out about it; that on that day, she and Taylor went to Lumberton because she had an appointment with her doctor; that after they left the doctor's office, they stopped at a drug store ostensibly for her to purchase some hair spray; that instead she purchased a bottle of Terro Ant Poison; that the next day, 1 February 1978, she put some of the poison in Taylor's tea at lunchtime; and that later that same day, she put more of the substance in Taylor's beer.

Defendant told the officers that she felt sure that what she had done was wrong but that she had not told anyone at the hospital about it on the two occasions that Taylor had been taken there for treatment. She stated that she gave Taylor the poison because she was afraid that he would "turn her in" for forgery. She further stated that she used the money she got out of the 31 January check to pay bills for doctors and medicine. She concluded by confessing that she had given poison to other persons besides Taylor and that they too had died.

Deputy Lovette then advised defendant that there was a possibility that a number of bodies would be exhumed. He asked her if arsenic would be found in the bodies. When she answered affirmatively, Deputy Lovette asked her in which bodies arsenic would be found.

Defendant admitted that while she lived and worked in the home of John Henry Lee as a housekeeper and nurse's aide in early 1977 she found a checkbook for an account in the joint names of Lee and his wife, Record; that she wrote a check on the account in the amount of $50.00; that Mr. and Mrs. Lee found out about the forgery and asked her about it; that she then purchased a bottle of poison, pausing to read the label which said "May be fatal if swallowed" and that she gave Mr. Lee poison three times — once in his tea and twice in his coffee.

The state introduced other evidence which tended to show: On or about 28 April 1977 Mr. Lee, 80 years old, became ill. Until then he had been in good health and attended to numerous chores around his home. On 29 April 1977, he was taken to the hospital complaining of vomiting and diarrhea. Though he was released from the hospital on 2 May 1977, he continued to be ill throughout the month of May, complaining of vomiting, diarrhea, and general pain through his body. On 3 June 1977, he was taken to the

hospital again where the attending physician, Dr. Alexander, observed that he was critically ill. Deep blue in color, his skin was cold and wet with perspiration. He was confused and unresponsive and his blood pressure was subnormal. On 4 June 1977 he died.

Though no autopsy was performed at the time of Mr. Lee's death, his body was exhumed pursuant to a court order on 18 March 1978 and taken to the office of the Chief Medical Examiner in Chapel Hill where an autopsy was performed. Toxicological screenings revealed that the liver contained an arsenic level of 2.8 milligrams percent and the muscle tissue contained an arsenic level of 0.3 milligrams percent. Dr. Page Hudson, Chief Medical Examiner of the State of North Carolina, testified that in his opinion Mr. Lee's death was caused by arsenic poisoning.

Defendant admitted to the officers that she had poisoned Mrs. Dolly Taylor Edwards; that in early 1976 she moved into the home of Mr. and Mrs. Montgomery Edwards in Lumberton as a live-in helper; that Mr. Edwards died on 29 January 1977; that in late February 1977 she drove to St. Pauls where she purchased a bottle of poison; that she noticed on the bottle the words "Could be fatal if swallowed"; that returning home she put some of the poison in Mrs. Edwards coffee and cereal; and that shortly afterwards Mrs. Edwards became ill, suffering from nausea and general weakness in her body.

The state introduced evidence that Mrs. Edwards was taken to the hospital on 27 February 1977, was treated and released. Her condition did not improve and she was again taken to the hospital on 1 March 1977 where she died later that evening. The attending physician, Dr. Henry Neill Lee, Jr., testified that Mrs. Edwards was dehydrated and suffered from nausea, diarrhea, and vomiting.

In her statement to the deputies, defendant said that she knew that the poison was responsible for the death of Mrs. Edwards; that after Mrs. Edwards died, she threw the bottle of poison into a field behind the Edwards residence; and that she did not know why she gave the poison to Mrs. Edwards.

Officer Lovette testified that during the course of his investigation he went to the field behind the Edwards home and

found an empty bottle of Singletary's Rat Poison which still bore the original label. He initialed the bottom of the bottle and kept it in his sole possession until the time of trial.

Though no autopsy was performed on the body of Mrs. Edwards at the time of her death, pursuant to a court order, her body was exhumed on 18 March 1978 and sent to the Office of the Chief Medical Examiner in Chapel Hill where an autopsy was performed. During the autopsy, toxicological screenings were conducted on samples of Mrs. Edwards' liver tissue and muscle tissue. In the liver tissue, there was found an arsenic level of 0.4 milligrams percent. In the muscle tissue, there was found an arsenic level of .08 milligrams percent. Dr. Page Hudson testified that in his opinion Mrs. Edwards' death was caused by arsenic poisoning.

Defendant further admitted in her statement to the deputies that she had poisoned her mother, Lillie McMillan Bullard; that during 1974 she lived with her mother in Parkton, N. C.; and that while she lived with her mother she forged her mother's name to a note in favor of the Commercial Credit Company of Lumberton. (Other testimony indicated that the note was in the amount of $1,048.00.) She further told the deputies that she was afraid that her mother would find out about the note; that she bought a bottle of poison and the bottle bore the warning "Can be fatal if swallowed"; that one day at dinnertime she put some of the poison in some soup and a soft drink and gave both to her mother; that later in the evening on the same day she gave her mother a soft drink which contained a dose of the poison; that Mrs. Bullard began to vomit and have diarrhea; and that she was taken to Cape Fear Valley Hospital in Fayetteville on 30 December 1974 where she died shortly after her arrival.

The attending physician, Dr. Weldon Jordan, testified that Mrs. Bullard was restless and gasping for breath when she was brought into the hospital; that she was in shock; and that he was unable to discern any blood pressure.

Upon the death of Mrs. Bullard, an autopsy was performed with the permission of her family, including defendant. No toxicological screenings were conducted at that time. Pursuant to a court order the body of Mrs. Bullard was exhumed on 18 March 1978 and taken to the Office of the Chief Medical Examiner in

Chapel Hill. Dr. William Frank Hamilton testified that he performed toxicological screenings upon samples of hair, muscle tissue and skin which had been taken from the body; that the hair sample revealed an arsenic concentration of .6 milligrams percent; that the muscle tissue had an arsenic level of .3 milligrams percent; that the skin sample had an arsenic level of .1 milligrams percent; and that in his opinion, Mrs. Bullard's death was caused by arsenic poisoning.

Although defendant did not admit any involvement in the death of her husband, Jennings L. Barfield, his body was exhumed pursuant to a court order on 31 May 1978. It was taken to the Office of the Chief Medical Examiner in Chapel Hill where an autopsy was performed. Toxicological screenings indicated that varying levels of arsenic were present in his body tissue.

Dr. Neil A. Worden testified that he treated Mr. Barfield when he was brought to the emergency room of the Cape Fear Valley Hospital in Fayetteville on 22 March 1971. At that time Mr. Barfield complained of nausea, vomiting, diarrhea and aching throughout his body. Mr. Barfield had been brought to the emergency room for the first time at about 11:00 p.m. on 21 March 1971. At that time he was treated and released. However, he returned to the hospital at 5:00 the next morning at which time he was given intravenous fluids. By the time that Dr. Worden first saw him at about 8:00 a.m., Mr. Barfield was in shock; his blood pressure was low; his pulse was rapid; and his complexion was ashen. Dehydrated and gasping for air, Mr. Barfield appeared to Dr. Worden to be in great pain. Dr. Hamilton testified that the cause of Mr. Barfield's death was arsenic poisoning.

At the close of the state's evidence, defendant made a motion to dismiss. Upon the court's denial of the motion, she presented evidence which tended to show:

During the month of January 1978 defendant was under the care of five doctors none of whom knew she was under the care of the others. She had been seeing the doctors for some time and had obtained prescriptions for a number of drugs from them. Among the drugs she was taking at that time were: Elavil, Sinequan, Tranxene, Tylenol III, and Valium. She had a history of drug abuse and had been admitted to the hospital at least four times for overdoses.

Two doctors, Dr. Arthur E. Douglas and Dr. Bob Rollins, testified that it was their opinion that while defendant was prone to abuse prescription drugs she was sane at the time of the death of Stewart Taylor, as well as at the time of trial. Though he declined to render an opinion as to defendant's sanity, Dr. Anthony Sainz, testifying by way of a deposition, agreed with the observations of Dr. Douglas and Dr. Rollins that there was no evidence that defendant suffered from any mental illness. Dr. Sainz also agreed with the conclusions of the other doctors that defendant was competent to stand trial and participate in her own defense. All of the doctors agreed that defendant knew the difference between right and wrong. Dr. Douglas and Dr. Rollins concluded that defendant had a passive-dependent type of personality whereas Dr. Sainz felt that she had a passive-aggressive personality.

Defendant took the stand on her own behalf. Her testimony was generally consistent with the statements she gave to Officers Lovette and Parnell. She admitted to poisoning Stewart Taylor, John Henry Lee, Dolly Taylor Edwards and her mother, Lillie McMillan Bullard. She had no recollection of what happened with regard to the death of her husband, Jennings L. Barfield. She stated that on 31 January 1978, the day she allegedly administered poison to Taylor, she took a quantity of medication at about 11:30 a.m.: three Sinequans, three Elavils, six Valiums, and four Tranxenes. She further stated that she was taking her medication in double doses in late January and early February 1978.

Defendant admitted that she had poisoned Dolly Taylor Edwards, but said that she could not offer any explanation as to why. She gave her reasons for poisoning Stewart Taylor, John Henry Lee and Lillie McMillan Bullard. As to Taylor, she stated that she had forged a check on his account. Fearing that Taylor would "turn her in" for forgery, she gave him Terro Ant Killer thinking it would make him sick. In regard to Lee, though her recollection was vague, she recalled that she had written a check on his account because she needed the money to pay for drugs, the same reason that she wrote checks on Taylor's account. In the case of her mother, defendant stated that she had forged the note at Commercial Credit Company because she needed the money to pay for drugs and visits to her various doctors.

The jury returned a verdict finding defendant guilty of the first-degree murder of Taylor.

The court then proceeded to conduct the sentencing phase of the trial before the same jury pursuant to G.S. 15A-2000 et seq. to determine if defendant's sentence on the murder conviction would be death or life imprisonment. The state offered no additional evidence. Defendant presented evidence which tended to show that prior to the death of her first husband in 1969 she did not abuse prescription drugs; following his death, however, she underwent a change in attitude and demeanor which was reflected in a pattern of drug abuse.

Issues as to punishment were submitted to and answered by the jury as follows:

1. Do you find beyond a reasonable doubt that the following aggravating circumstance(s) exist?

    a. The murder of Stewart Taylor was committed for pecuniary gain.

    ANSWER: <u>YES</u>

    b. The murder of Stewart Taylor was committed to hinder the enforcement of the law.

    ANSWER: <u>YES</u>

    c. The murder was especially heinous, atrocious or cruel.

    ANSWER: <u>YES</u>

2. Do you find that one or more of the following mitigating circumstances exist?

    a. The murder was committed while the defendant was under the influence of mental or emotional disturbance.

    ANSWER: <u>NO</u>

    b. The capacity of the defendant to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was impaired.

    ANSWER: <u>NO</u>

    c. Other circumstances which the jury deems to have mitigating value:

3. Do you find beyond a reasonable doubt that the mitigating circumstance(s) (is) (are) insufficient to outweigh the aggravating circumstance(s)?

ANSWER: YES

4. Do you find beyond a reasonable doubt that the aggravating circumstance(s) (is) (are) sufficiently substantial to call for the death penalty?

ANSWER: YES

The jury recommended that a sentence of death be imposed upon the defendant. Pursuant thereto the court imposed the death sentence.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Richard L. Griffin, for the State.*

*Robert D. Jacobson for defendant-appellant.*

BRITT, Justice.

We find no prejudicial error in either phase of defendant's trial and conclude that the verdicts and judgments should not be disturbed. We will discuss the errors assigned under each phase.

PHASE I—GUILT DETERMINATION

[1] By her first assignment of error defendant contends that the trial court erred in denying her motion for the appointment of additional counsel. There is no merit in this assignment.

When it had been determined that defendant was indigent, Attorney Robert D. Jacobson of the Robeson County Bar was appointed to serve as her counsel. At an early stage of the proceedings against defendant, Mr. Jacobson learned that the defendant was suspected of having committed at least four other murders by poisoning in addition to the one that she then stood accused of. On 15 March 1978 a motion was made that additional counsel be appointed to assist Mr. Jacobson in representing defendant. District Judge Charles G. McLean denied the motion after conducting a hearing.

It is the responsibility of the state to provide an indigent defendant with counsel and the other necessary expenses of representation. G.S. 7A-450. However, defendant's right to court-appointed counsel does not include the right to require the court to appoint more than one lawyer unless there is a clear showing that the first appointed counsel is not adequately representing the interests of the accused. *People v. Marsden*, 2 Cal. 3d 118, 465 P. 2d 44, 84 Cal. Rptr. 156 (1970). In making that determination the legitimate interest that the state has in securing the best utilization of its legal resources must be considered along with the interests of the defendant. *Cf. State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977) (appointment of two attorneys for each defendant in a murder trial critized).

While there may be situations in which the right to the effective assistance of counsel can be safeguarded only by the appointment of additional counsel, such a situation is not present in this case. Though defendant was suspected of having poisoned four persons other than Stewart Taylor, no charges were brought in connection with those deaths. While it is true that the state introduced evidence at trial which tended to show that defendant was involved in those deaths, the burden imposed upon defense counsel was not excessive. It is not unusual for a defendant to be tried for a number of offenses in one trial. Nor is it uncommon for evidence of other acts of misconduct to be introduced in a criminal trial to show motive, intent, or a scheme or plan. An attorney who is representing a criminal defendant must be prepared to deal with such evidence as it arises in the course of the trial. Though Mr. Jacobson carried a great burden in representing the defendant in a capital case, we do not find it to have been so disproportionate to that borne in the usual course of criminal defense work so as to have required the court to have appointed another attorney to provide assistance. We would add, parenthetically, that Judge McLean's order reflects favorably upon Mr. Jacobson's professional background and experience, indicating that he was competent to represent the best interests of the defendant. It is our opinion that Mr. Jacobson gave defendant high quality representation.

[2] By her second assignment of error, defendant contends that the court improperly denied her motion for a change of venue to the western part of the state. In her third assignment of error,

she contends that the court erred in moving the case from Scotland County to Bladen County for trial. These assignments are interrelated and will be dealt with accordingly. Neither is meritorious.

On 19 April 1978 defendant moved for a change of venue to the western part of the state pursuant to G.S. 15A-957. She contended that she would be unable to secure a fair and impartial trial in Robeson County because of extensive pretrial publicity. Following a hearing on the motion, Judge Hobgood ordered that the case be removed to Scotland County.

On 1 November 1978 the district attorney moved that the case be transferred from Scotland County to Bladen County for the reasons that there were only four weeks of criminal superior court scheduled for Scotland County during 1978, defendant was scheduled to be tried during the 27 November 1978 Session of Scotland Superior Court, and there were approximately twenty persons confined to jail who were awaiting trial at that session. Though defendant objected to the change of venue, stating that she was satisfied with Scotland County, Judge Hobgood granted the motion and ordered that the case be removed to Bladen County for trial.

G.S. 15A-957 provides that if the court determines, upon the motion of the defendant that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either transfer the proceeding or order a special venire from another county. The *statutory power* of the court to change the venue of a trial is limited to transferring the case to an adjoining county in the judicial district or to another county in an adjoining judicial district. G.S. 15A-957. Notwithstanding this apparent statutory limitation upon the power of a court to order a change of venue, a court of general jurisdiction, of which our superior court is one, *Bryant v. Dougherty*, 267 N.C. 545, 148 S.E. 2d 548 (1966), has the inherent authority to order a change of venue in the interests of justice. *English v. Brigman*, 227 N.C. 260, 41 S.E. 2d 732 (1947). In either case, a motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed on appeal in the absence of a showing of an abuse of discretion. *State v. Alford*, 289 N.C. 372, 222 S.E. 2d 222,

*death sentence vacated,* 429 U.S. 809, 50 L.Ed. 2d 69, 97 S.Ct. 46 (1976); *State v. Mitchell,* 283 N.C. 462, 196 S.E. 2d 736 (1973); *State v. Blackmon,* 280 N.C. 42, 185 S.E. 2d 123 (1971).

There has been no showing of an abuse of discretion in this instance. While it is true that there is evidence in the record which tends to show that a radio station in Lumberton as well as newspapers in Robeson County and surrounding counties gave coverage to the pending trial, there is nothing which suggests that the coverage was anything more than general in nature and likely to be found in any jurisdiction to which the trial might be removed. *See, State v. Alford, supra; see also* Annot., 33 A.L.R. 3d 17 (1970). Furthermore, Judge Hobgood, in view of the Speedy Trial Act, G.S. 15A-701 et seq. had to consider the rights of the twenty other defendants awaiting trial in Scotland County as well as the rights of the defendant in this case.

[3] In her fourth assignment of error, defendant asserts that the trial court erred in refusing to grant her motion for a continuance. This assignment has no merit.

On 1 November 1978 the court was advised that one of defendant's witnesses, Dr. Anthony Sainz, was hospitalized and not expected to be released soon thereafter. Defendant moved for a continuance. Following a hearing, Judge McKinnon denied the motion but provided that defendant could renew her motion upon obtaining a written statement by a physician that Dr. Sainz would not be able to testify or give a deposition before or during the week of 27 November 1978, the week defendant's case was scheduled for trial. On 27 November 1978, with Dr. Sainz still hospitalized, defendant renewed her motion for a continuance. The motion was denied. On 30 November 1978 the deposition of Dr. Sainz was taken in his hospital room at the Cape Fear Valley Hospital. Defendant's attorney, the district attorney, the presiding judge, and a court reporter were present at the time the deposition was taken.

A motion for a continuance is ordinarily addressed to the sound discretion of the court and will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Rigsbee,* 285 N.C. 708, 208 S.E. 2d 656 (1974); *State v. Cox,* 281 N.C. 275, 188 S.E. 2d 356 (1972); *State v. Stepney,* 280 N.C. 306, 185 S.E. 2d 844 (1972). However, when the motion for continuance is based upon

a right which is guaranteed by the State or Federal Constitutions, the question is not one of discretion but one of law and is reviewable upon appeal. *State v. Smathers*, 287 N.C. 226, 214 S.E. 2d 112 (1975); *State v. Robinson*, 283 N.C. 71, 194 S.E. 2d 811 (1973).

Defendant argues that the standards enunciated in *Smathers* and *Robinson* ought to control the disposition of her case. We disagree. Contrary to the allegations of defendant, this is not a case where a continuance could properly have been based upon her Sixth Amendment right to have compulsory process issue to secure the presence of witnesses in her behalf. The facts of *State v. Rigsbee, supra,* are similar to the facts of this case. In *Rigsbee* this court applied the abuse of discretion standard of review to uphold the trial judge's denial of a motion for a continuance when a confidential informant under subpoena failed to appear at trial. In *Rigsbee,* as well as in the present case, the motion for a continuance was predicated upon the absence of a witness sought by the defendant. The present case differs from *Rigsbee* in that the testimony of Dr. Sainz was obtained and presented before the jury by way of deposition. While it is true that the demeanor and appearance of a witness upon the stand before the jury may prove to be beneficial to the party who offers the witness' testimony, a deposition is an accepted means of perpetuating and presenting the testimony of an unavailable witness. G.S. § 8-74. One of the specific grounds upon which a deposition may be taken and offered into evidence at a criminal trial is such an infirmity or physical incapacity on the part of a witness that the defendant is unable to procure his attendance at trial. Such were the facts in the present case. Dr. Sainz was then suffering from tuberculosis and was not expected to be able to return to his office before the first of the year (1979). Therefore, we conclude that the court did not abuse its discretion in denying defendant's motion for a continuance.[1]

[4] In her sixth assignment of error, defendant contends that the trial court erred in refusing to grant her motion for an individual *voir dire* of each juror and sequestration of the jurors during *voir dire*. This assignment has no merit.

---

1. When this case was argued, defendant's counsel advised the court that Dr. Sainz died sometime after his deposition was taken.

A pretrial motion for an individual *voir dire* of each juror and for sequestration of the jurors during *voir dire* was made by defendant on 25 April 1978. The motion was denied in chambers immediately before the trial began. The court directed that twelve prospective jurors be seated in the jury box during *voir dire*. All other prospective jurors were excluded from the courtroom until such time as they were seated in the jury box to replace a venireman who had been excused.

A motion for an individual *voir dire* is addressed to the sound discretion of the court and will not be disturbed except for an abuse of discretion. *State v. Thomas*, 294 N.C. 105, 240 S.E. 2d 426 (1977); *State v. Young*, 287 NC. 377, 214 S.E. 2d 763 (1975), *death sentence vacated* 428 U.S. 903, 49 L.Ed. 2d 1208, 96 S.Ct. 3207 (1976). Defendant argues that a collective *voir dire* enables the jurors to digest the answers of each other and consider answers that would result in their exclusion from the panel. A domino effect is then alleged to take place, whereby juror after juror professes an aversion to the death penalty in order to be relieved of jury duty. At best, defendant's argument is speculative. There is no showing that any such thing occurred during defendant's trial. We find no basis upon which to disturb the exercise of the trial court's discretion.

[5] In her seventh assignment of error, defendant contends that the trial court erred in allowing the state to challenge for cause certain jurors who voiced general objections to capital punishment or who expressed conscientious or religious scruples against the death penalty. Defendant asserts that an examination of the record reveals that several of the prospective jurors who were challenged for cause by the district attorney and excused by the court were merely ambivalent toward the death penalty. This assignment is without merit.

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L.Ed. 2d 776, 784-85, 88 S.Ct. 1770, *rehearing denied*, 393 U.S. 898, 21 L.Ed. 2d 186, 89 S.Ct. 67 (1968). *See also* Cook, Constitutional Rights of the Accused: Trial Rights § 117 (1974); 3 Whar-

ton's Criminal Procedure § 461 (13th ed. 1975). Unless a venireman is irrevocably committed before the trial begins to vote against the death penalty regardless of what the facts and circumstances might prove to be from the evidence adduced at trial, he cannot be excluded from the panel. *Davis v. Georgia,* 429 U.S. 122, 50 L.Ed. 2d 339, 97 S.Ct. 399 (1976). If a venireman who is not so committed is improperly excluded, any subsequently imposed death sentence cannot stand. *Davis v. Georgia, supra.*

A prospective juror is properly excused for cause when his answers on *voir dire* concerning his attitudes toward the death penalty, although equivocal, show when considered contextually that regardless of the evidence he would not vote to convict the defendant if conviction meant the imposition of the death penalty. *State v. Bernard,* 288 N.C. 321, 218 S.E. 2d 327 (1975); *State v. Simmons,* 286 N.C. 681, 213 S.E. 2d 280 (1975); *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142 (1975), *death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d 1209, 96 S.Ct. 3209 (1976). *See generally* Annot., 39 A.L.R. 3d 550 (1971).

While it is true that taken by themselves, the answers that some of the jurors called to serve in defendant's trial seem to be equivocal or contradictory, taken as a whole, the examination indicates opposition to the death penalty so strong that they could not vote to impose it regardless of the evidence. The words of Justice (now Chief Justice) Branch from *State v. Bernard* are instructive on this point. In *Bernard,* the following exchange took place on *voir dire:*

Q. Do you have any religious or moral scruples or beliefs against capital punishment?

A. Well, I don't believe in the death penalty, no.

Q. Sir?

A. I don't believe in the death penalty, no.

Q. It would be impossible regardless of the evidence for us to put enough evidence in there to satisfy you to bring in a verdict of guilty if that meant the imposition of the Death Penalty, is that right?

In reference to this exchange, Justice Branch commented, "An unequivocal answer to the final question asked by the solicitor

would have determined prospective juror Gantt's competence to serve on the panel *so far as the Witherspoon rule might apply.*" (Emphasis added.) Our examination of the record in the case now before us would seem to indicate that the benchmark laid down in *Bernard* was met. In her brief, defendant mentions the *voir dire* of three jurors in particular: Mr. Dent, Miss Grimes, and Miss McKoy. After each was challenged for cause by the district attorney, the presiding judge proceeded to conduct an examination of their attitudes toward the death penalty. In response to questioning by the court, each of the named jurors indicated that no matter what aggravating circumstances were established by the evidence, he or she could not vote to impose a death sentence. These unequivocal responses satisfy the demands of *Bernard.* There was no error.

[6] Defendant assigns as error the admission of evidence concerning the deaths of John Henry Lee, Dolly Taylor Edwards, Lillie McMillan Bullard and Jennings Barfield. The evidence tended to show that defendant was responsible not only for the poisoning death of Stewart Taylor for which she was charged but also for the poisoning deaths of the other four individuals. The evidence further tended to show that she had committed additional acts of forgery and uttering. This assignment has no merit.

Evidence that a defendant has committed other offenses is inadmissible on the issue of guilt if its only relevancy is to show the character of the accused or his disposition to commit an offense of the nature of the one charged; but if it tends to prove any other relevant fact it will not be excluded merely because it also shows guilt of another crime. *State v. McQueen,* 295 N.C. 96, 244 S.E. 2d 414 (1978); *State v. Stegmann,* 286 N.C. 638, 213 S.E. 2d 262 (1975), *death sentence vacated,* 49 L.Ed. 2d 1205, 96 S.Ct. 3203 (1976); 1 Stansbury's North Carolina Evidence § 91 (Brandis Rev. 1973).

The rule is predicated upon the law's desire to preserve for the accused in an unencumbered state the presumption of innocence which is at the heart of every criminal prosecution. *See State v. Christopher,* 258 N.C. 249, 128 S.E. 2d 667 (1962). Furthermore, the rule operates to protect the defendant from the surprise introduction of extraneous matters which are unduly prejudicial because their probative value is outweighed by the danger that the issues before the jury will be confused and the

trial's length will be prolonged. *See generally* McCormick on Evidence § 190 (2d ed. 1972); 1 Wharton's Criminal Evidence § 240 (13th ed. 1972). Notwithstanding these important considerations of public policy, there are a number of instances where the probative value of such evidence outweighs the specter of unfair prejudice to the defendant. *Cf. State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954) ("The general rule excluding evidence of the commission of other offenses by the accused is subject to certain well recognized exceptions, which are said to be founded on as sound reasons as the rule itself.") We perceive at least four grounds upon which evidence tending to show that defendant poisoned four individuals other than Stewart Taylor would be relevant.

It is clear that evidence that a defendant committed other offenses is relevant to establish a defendant's knowledge of a given set of circumstances when such a set of circumstances is logically related not only to the crime the defendant is on trial for but also is logically related to the extraneous offense. *State v. Walker,* 251 N.C. 465, 112 S.E. 2d 61, *cert. denied,* 364 U.S. 832, 5 L.Ed. 2d 58, 81 S.Ct. 45 (1960); *State v. McClain, supra; State v. Smoak,* 213 N.C. 79, 195 S.E. 72 (1938); McCormick on Evidence § 190 (2d ed. 1972); 1 Stanbury's North Carolina Evidence § 92 (Brandis Rev. 1973); 2 Wigmore on Evidence § 363 (1940). The *Smoak* case is particularly illustrative of this point.

In *Smoak,* the defendant was on trial for the first-degree murder of his daughter, Annie Thelma Smoak. Though she died on 1 December 1936, Annie was taken to a hospital on Thanksgiving Day, 1936, and treated for symptoms of strychnine poisoning. An autopsy indicated that the cause of her death was strychnine poisoning. At trial the state was permitted to introduce evidence tending to show that the defendant's second wife had died from strychnine poisoning. This court upheld the admission of the evidence, offering a number of grounds upon which it was relevant. One of the grounds of relevancy noted in the opinion was showing the defendant's knowledge of the effect of a particular poison, citing with approval the leading cases of *Goersen v. Commonwealth,* 99 Pa. 388 (1882), and *Zoldoske v. State,* 82 Wis. 580, 52 N.W. 778 (1892). It is appropriate to apply the principle of *Smoak* to the facts of the present case. When she took the stand in her own defense, the defendant testified:

On Tuesday, after the weekend, I had to come to Lumberton to Dr. Baker's office to have a dressing changed and on the way back home, we stopped at Eckerd's Drug Store to get some hair spray and there is where I purchased the Terro [Ant Killer]. *I purchased it because I thought it would make him [Stewart Taylor] sick. I did intend to give it to him.* (Emphasis added.)

Earlier, in the presentation of the state's case-in-chief, the statement which the defendant had given to Officers Parnell and Lovette was introduced into evidence. In her statement, the defendant confessed:

I had given poison to people before and they died. The label (on the bottle of poison) read, "May be fatal if swallowed."

The defendant's testimony from the stand is at odds with the clear implication of the statement that she gave to the deputies, i.e., that she knew the fatal properties of the insecticide. The evidence which relates to the deaths of the other four individuals is, therefore, admissible to show that the defendant knew the probable consequences of her actions when she administered the poison to Stewart Taylor. Its relevancy is made more striking when one notes that defendant entered a plea of not guilty by reason of insanity in addition to a general plea of not guilty. The test of insanity as a defense to a criminal charge is whether the accused, at the time of the alleged act, was laboring under such a defect of reason, from disease or deficiency of the mind, as to be incapable of knowing the nature and quality of the act, or, if he does know this, was by reason of such defect of reason, incapable of distinguishing between right and wrong in relation to such act. *State v. Jones,* 293 N.C. 413, 238 S.E. 2d 482 (1977); *see also,* W. LaFave & A. Scott, Handbook on Criminal Law § 37 (1972); Comment, The Insanity Defense in North Carolina, 14 Wake Forest L. Rev. 1157 (1978). For a defendant to know the nature and quality of his act, he must have understood the physical nature and consequences of the act. *State v. Terry,* 173 N.C. 761, 92 S.E. 154 (1917); *State v. Spivey,* 132 N.C. 989, 43 S.E. 475 (1903); *see also* LaFave & Scott, *supra,* § 37; Comment, The Insanity Defense in North Carolina, *supra* at 1166-1168. Since the defendant tendered a plea of not guilty by reason of insanity, it was in issue whether

or not the defendant knew the physical nature and consequences of her actions. Accordingly, the *Smoak* holding is buttressed further.

Evidence that defendant poisoned four individuals in addition to Stewart Taylor was relevant for the purpose of showing her intent. Evidence of other offenses is properly admitted whenever it is necessary to prove that a defendant had a specific intent or that a particular act was done intentionally rather than accidentally. *State v. Jenerett,* 281 N.C. 81, 187 S.E. 2d 735 (1972); *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652 (1969); McCormick on Evidence § 190 (2d ed. 1972); 1 Stansbury's North Carolina Evidence § 92 (Brandis Rev. 1973). Though homicide which is committed by use of poison does not differ in its substantive elements from homicide committed by other means, the deliberative features which usually attend the use of poison have historically caused the courts to receive evidence of its prior uses in order to show intent. 2 Wigmore on Evidence § 363, n. 11 (1940). Such evidence is clearly relevant in a prosecution for first-degree murder in that the state must prove a specific intent to kill if it is to win a conviction. *State v. Wilson,* 280 N.C. 674, 187 S.E. 2d 22 (1972). Defendant was tried for first-degree murder. Evidence that she had previously administered poison to others was competent to show specific intent on her part in that she had a pattern of administering poison to persons, knowing full well the probable consequences of her actions.

Evidence of other offenses is relevant to establish a defendant's motive in engaging in criminal conduct. *State v. Poole,* 289 N.C. 47, 220 S.E. 2d 320 (1975); *State v. Arnold,* 284 N.C. 41, 199 S.E. 2d 423 (1973); *State v. Smoak, supra;* McCormick on Evidence § 190 (2d ed. 1972); 1 Stansbury's North Carolina Evidence § 92 (Brandis Rev. 1973). Again, the facts of the *Smoak* case are pertinent in explaining this point. In *Smoak,* the state was allowed to introduce evidence that tended to show a pattern of similar deaths which were followed by the defendant filing proof of death and collecting the proceeds of life insurance policies he had procured on the lives of the decedents. Such evidence was deemed competent to show the defendant's motive in administering poison to his daughter, for whose death he was being tried. These facts are analogous to the facts of the case at bar. The state presented evidence which tended to show a pattern of behavior on the part

of defendant in perpetrating a repeated number of forgeries which were accompanied by the discovery of the forgery or of a fear on the part of defendant that they would be discovered. The state's evidence tended to show that defendant poisoned the individuals, with the exception of Dolly Taylor Edwards, only after the forgeries were discovered or when she became fearful of discovery. The evidence tends, therefore, to establish a motive for the crimes.

Furthermore, the evidence tends to establish the existence of a continuing plan or scheme on the part of defendant. The state established that defendant used the proceeds of her forgeries to support her drug addiction. The state further showed that in each instance, with the exception of Mrs. Edwards, the deaths were preceded by conduct which resulted in pecuniary gain to the defendant. The deaths were, therefore, the product of the same motivation to act on the part of the defendant and reflected an ongoing design on her part to assure the support of her drug habit.

Evidence of other offenses is admissible if it tends to show the existence of a plan or design to commit the offense charged, or to accomplish a goal of which the offense charged is a part or toward which it is a step. *State v. Greene*, 294 N.C. 418, 241 S.E. 2d 662 (1978); *State v. Hunter*, 290 N.C. 556, 227 S.E. 2d 535 (1976), *cert. denied*, 429 U.S. 1093, 51 L.Ed. 2d 539, 97 S.Ct. 1106 (1977); *State v. Grace*, 287 N.C. 243, 213 S.E. 2d 717 (1975); McCormick on Evidence § 190 (2d ed. 1972); 1 Stansbury's North Carolina Evidence § 92 (Brandis Rev. 1973). When it is offered for this purpose, such evidence ought to be examined with special care to see that it is really relevant to the establishment of a design or plan rather than merely showing character or a disposition to commit the offense charged. 1 Stansbury's North Carolina Evidence § 92 (Brandis Rev. 1973). A mere similarity in results is not a sufficient basis upon which to receive evidence of other offenses. Instead, there must be such a concurrence of common features that the assorted offenses are naturally explained as being caused by a general plan. 2 Wigmore on Evidence § 304 (3d ed. 1940). This requirement is grounded in the proposition which underlies much of the law of criminal evidence. The prosecution ought not to be able to introduce evidence of other criminal offenses of the defendant unless the evidence is relevant for some

other purpose than to show that the defendant is guilty because he has a criminal disposition. *See* McCormick on Evidence § 190 at p. 447 (2d ed. 1972).

A careful examination of the facts of the present case reveals the concurrence of common features that Dean Wigmore refers to in his treatise. This concurrence is found in the showing that prior to the death of each victim, defendant had lived or worked in his or her home; and that the means of inflicting death was identical in each instance. In the cases of Stewart Taylor, John Henry Lee and Lillie McMillan Bullard, there was evidence that the defendant had executed a forgery that resulted in pecuniary gain to her before their deaths. The forgeries which were committed against Taylor and Lee were discovered. Defendant became afraid that the forgery that she had committed against her mother would be discovered. It was only then, in each instance, that she obtained poison and administered it to her intended victim.

In light of the foregoing, it is clear that the evidence was properly admitted under the rules of evidence as they have been accepted and interpreted in North Carolina and by the weight of the leading authorities in the field. It therefore follows that since the evidence of the other deaths was properly admitted as components of the state's case, it was not error for the district attorney to refer to them in his argument before the jury. While it is true that an attorney may not travel outside of the record and inject into his argument facts which are not in evidence, *Jenkins v. Harvey C. Hines*, 264 N.C. 83, 141 S.E. 2d 1 (1965), there is no prohibition against an attorney making reference in his argument to evidence which has been properly admitted. Nor was there error in the instructions the court gave the jury as to how they might consider the evidence concerning the other deaths. The court instructed the jury that the evidence was received and was to be considered by them only for the purpose of showing that the defendant had the intent required for first-degree murder, that she knew that the administration of poison would cause the death of Stewart Taylor, and that there existed in her mind a plan or scheme or design on her part to kill Stewart Taylor. Judge McKinnon's charge properly stated the applicable law as it is enunciated above, reminding them that "evidence of guilt of

such charges would not be evidence of guilt of the present charge . . . ."

[7] Defendant assigns as error the admission of certain evidence for the reason that its sole purpose was to inflame the minds of the jurors against her. She further contends that throughout the trial, the district attorney presented the case for the state in such a way that he was guilty of prosecutorial misconduct. We disagree with these contentions.

Every criminal defendant is entitled to have a fair trial which is conducted before an impartial judge and unprejudiced jury in an atmosphere of calm deliberation. *State v. Locklear,* 294 N.C. 210, 241 S.E. 2d 65 (1978); *State v. Britt,* 288 N.C. 699, 220 S.E. 2d 283 (1975); *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561 (1971). The obligation to take steps to assure a defendant's right to a fair trial rests upon the shoulders of both the presiding judge and the district attorney. *State v. Britt, supra; State v. Monk,* 286 N.C. 509, 212 S.E. 2d 125 (1975); *State v. Phillips,* 240 N.C. 516, 82 S.E. 2d 762 (1954). However, it should be noted that the obligation of the district attorney to conduct himself in such a manner as to assure the right to a fair trial does in no way lessen his obligation to the state to prosecute criminal charges to the best of his abilities on the basis of the evidence that he is able to bring before the jury. *See State v. Britt, supra; State v. Stegmann, supra; State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572 (1971), *death sentence vacated,* 408 U.S. 939, 33 L.Ed. 2d 761, 92 S.Ct. 2873 (1972). Accordingly, counsel is given wide latitude in the argument of hotly contested trials, subject to the exercise of the sound discretion of the presiding judge. *State v. Monk, supra; State v. Westbrook, supra; State v. Seipel,* 252 N.C. 335, 113 S.E. 2d 432 (1960). The district attorney has the right and the duty to cross-examine vigorously a defendant who takes the stand in his own defense, *State v. Ross,* 275 N.C. 550, 169 S.E. 2d 875 (1969), *cert. denied,* 397 U.S. 1050, 25 L.Ed. 2d 665, 90 S.Ct. 1387 (1970); *State v. Wentz,* 176 N.C. 745, 97 S.E. 420 (1920).

The district attorney's performance of his duties as public prosecutor is tempered by his obligation to the defendant to assure that he is afforded his right to a fair trial. Therefore, he may not, by argument or by cross-examination, place before the jury incompetent and prejudicial matters. *State v. Noell,* 284 N.C.

670, 202 S.E. 2d 750 (1974), *death sentence vacated,* 428 U.S. 902, 49 L.Ed. 2d 1205, 96 S.Ct. 3203 (1976); *State v. Dockery,* 238 N.C. 222, 77 S.E. 2d 664 (1953). This rule is violated by asking questions which are phrased impertinently or insultingly so as to badger or humiliate a witness. *State v. Daye,* 281 N.C. 592, 189 S.E. 2d 481 (1972); *State v. Wyatt,* 254 N.C. 220, 118 S.E. 2d 420 (1961). Nor may he place before the jury evidence whose only effect is to excite prejudice or sympathy. *State v. Britt, supra; State v. Lynch, supra; State v. Rinaldi,* 264 N.C. 701, 142 S.E. 2d 604 (1965). The test that is to be applied is whether the evidence tends to shed any light upon the subject matter of the inquiry or has as its only effect the exciting of prejudice or sympathy. *State v. Braxton,* 294 N.C. 446, 242 S.E. 2d 769 (1978).

In her brief, defendant refers to a number of instances of alleged misconduct on the part of the district attorney in the prosecution of this case. While we do not perceive a need to discuss these allegations in great detail, we will proceed to discuss each one briefly in light of the foregoing principles of law.

John D. McPherson, a member of the St. Pauls Rescue Squad, as well as an employee of the Robeson County Ambulance Service, testified during the state's case-in-chief as to the condition of Stewart Taylor when he was taken back to the hospital on 3 February 1978. McPherson had the opportunity to observe the decedent not only at his home but also during the trip to the hospital as well as at the emergency room of Southeastern General Hospital. McPherson testified that he and two ambulance attendants had to restrain Taylor so that the emergency room personnel could administer shots and intravenous fluids. It was his testimony that Taylor's hands, arms, and legs had to be held down in order to keep him in the bed in the emergency room. McPherson testified that he worked to restrain Taylor until he threw back his head and screamed. At that time, McPherson ran from the room and summoned a nurse after which a doctor began to administer a tracheotomy. The following exchange then took place on direct examination:

Q. How loud was the scream that you say he uttered?

A. Fairly loud.

Q. Can you duplicate it here?

MR. JACOBSON: Object.

COURT: Overruled, if he can.

A. Well, he just threw back his head and said (witness made screaming noise).

MR. JACOBSON: Object. Move to strike.

COURT: Overruled, motion denied.

The conduct of the witness amounts, in substance, to a courtroom demonstration. The conditions under which demonstrations are performed must correspond in all essential particulars with those existing at the time and place of the event. *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963). The circumstances need not be identical, but a reasonable or substantial similarity is sufficient. *State v. Phillips,* 228 N.C. 595, 46 S.E. 2d 720 (1948). So long as that touchstone is met, the weight that is to be given to the demonstration is for the jury to decide. *State v. Brown,* 280 N.C. 588, 187 S.E. 2d 85 (1972). The degree of similarity is a question upon which the trial judge must exercise his discretion in evaluating. *State v. Carter,* 282 N.C. 297, 192 S.E. 2d 279 (1972). We perceive no abuse of discretion on the part of the trial judge. The witness was present at the time of the incident to which he was testifying. The demonstration did serve to complete his account of the condition of Taylor before he died and the pain he was experiencing. Any demonstration in some sense and to some degree breaches the customary decorum of the courtroom. It is only with great caution that this decorum should be breached. Such caution is allowed for when the demonstration is necessary in order to allow the trier of fact to fully understand the facts and circumstances of the case that is before it.

Dr. John D. Larson testified for the state concerning the condition Stewart Taylor was in when he was taken back to the hospital on 3 February 1978. During redirect examination by the district attorney, the following exchange took place.

A. . . . I have indicated that I have never treated an arsenic case.

MR. BRITT: Is that to say arsenic is more or less exotic or not?

MR. JACOBSON: Object.

COURT: Sustained.

The question was improper because it called for an opinion on the part of a witness who had not been properly qualified and offered as an expert competent to state an opinion. *See generally* 1 Stansbury's North Carolina Evidence §§ 133-134 (Brandis Rev. 1973). However, the witness did not have an opportunity to answer the propounded question in that the timely objection of defense counsel was sustained by the court. No evidence was elicited by the district attorney in response to the question. We find no prejudice.

Alice Storms, Stewart Taylor's daughter, testified on behalf of the state. During her direct examination, the district attorney pursued a line of questioning which tended to show that Taylor was accustomed to carrying large sums of money with him in his wallet. Mrs. Storms testified that after her father died at the hospital she received his personal property, including his wallet. When defendant gave Mrs. Storms Taylor's wallet, it contained two dollars. Defendant contends that the line of questioning was irrelevant. We do not find that to be the case. The evidence was relevant on the issue of the defendant's motive in committing the crime. It was competent because the witness was testifying as to facts within her personal knowledge.

Ellen Mintz, Jennings Barfield's daughter, testified on behalf of the state. In a line of questioning, the district attorney tried to elicit information concerning the nature and extent of her father's estate. He also sought to place before the jury whether the defendant received any of the proceeds of the estate or of any insurance. Repeatedly, objections made by defense counsel were sustained by the presiding judge when the witness would attempt to testify as to what she had been told what defendant had received from the estate. At other times she attempted to testify as to her assumptions as to what defendant had received from the estate. The objections were properly sustained. There is nothing in the law of evidence which serves to prevent an attorney from persisting in his efforts to obtain competent evidence from a witness. There is nothing in the record which indicates that the district attorney was badgering his own witness. Nor is there

anything in the record which suggests that the questions were not asked in good faith.

When defendant took the stand on her own behalf, the district attorney asked her during cross-examination if she had poisoned Record Lee, the wife of John Henry Lee. Defendant denied having given any poison to Mrs. Lee. It was only after defendant answered the question that an objection was made. The district attorney did not, as defendant contends, accuse defendant of poisoning Record Lee. When defendant denied that she had done so, the district attorney elected not to pursue the matter. There was no prejudice.

After defendant admitted on the stand to having poisoned Dolly Taylor Edwards, the district attorney posed the following question to her:

> Q. And the reason you poisoned her to death was because she was just a cantankerous old lady to live with, wasn't she?

Defendant's attorney objected and the court sustained the objection as to form. Assuming the question was improper as a breach of courtroom decorum, in light of the overall conduct of the trial and the evidence otherwise presented against defendant, we perceive no prejudice.

[8] Defendant contends that the trial court erred in receiving several items into evidence without first requiring that an adequate foundation be laid. There is no merit in this contention.

In the statement which she gave to Officers Lovette and Parnell, defendant admitted poisoning Dolly Taylor Edwards saying:

> I went to D. D. McCall's store and bought a bottle of poison. It was in a plastic bottle. The label read "Could be fatal if swallowed." I came back home and put some of it in her coffee and cereal . . . . I knew what I gave her caused her death. I threw the bottle in the field back of the house.

During his investigation, Officer Lovette went to the home of Mrs. Edwards, went around to the back of the house and to the spot where defendant said she had thrown the bottle. There, he found an empty bottle which bore the label of "Singletary's Rat

Poison." Officer Lovette testified that he initialed the bottom of the bottle when he recovered it and that he had kept the bottle in his sole possession from the time he recovered it to the time of the trial with no one else having access to it. Defendant argues that the bottle was inadmissible on the grounds of remoteness in that more than a year had passed from the time she allegedly threw it in the field and the time it was recovered.

Real evidence is that evidence which is provided by producing for inspection at trial a particular item rather than having witnesses describe it. 1 Stansbury's North Carolina Evidence § 117 (Brandis Rev. 1973). A two-pronged foundation must be laid before such evidence is properly received in evidence. First, the item which is offered must be identified as being the same object involved in the incident at issue. *State v. Harbison*, 293 N.C. 474, 238 S.E. 2d 449 (1977); *State v. Winford*, 279 N.C. 58, 181 S.E. 2d 423 (1971). Officer Lovette testified that he recognized state's Exhibit Number Ten as being the bottle he found in the field behind Mrs. Edwards' house. Second, it must also be shown that since the incident in which it was involved, the object has undergone no material change in its condition. *State v. Harbison, supra; Hunt v. Wooten*, 238 N.C. 42, 76 S.E. 2d 326 (1953). Officer Lovette testified that the label was still on the bottle and was recognizable when he recovered it in the field. He further testified that it had been in his sole custody until the time of trial. The trial judge possesses and must exercise sound discretion in determining the standard of certainty that is required to show that the object which is offered is the same object involved in the incident in issue and that the object is in an unchanged condition. *State v. Harbison, supra.* Abuse of discretion is not shown here.

Nor is there evidence of an abuse of discretion on the part of the presiding judge in receiving into evidence the various checks that defendant is alleged to have forged upon the accounts of Stewart Taylor and John Henry Lee. During her direct examination, Alice Storms identified six checks bearing her initials for identification as being checks bearing the signature of her father, Stewart Taylor. She was then shown three other checks which she identified as not bearing the authentic signature of her father. A lay person is competent to state an opinion as to the

handwriting of an individual provided that the witness is familiar with the handwriting of that person. *In re Bartlett*, 235 N.C. 489, 70 S.E. 2d 482 (1952); *Lee v. Beddingfield*, 225 N.C. 573, 35 S.E. 2d 696 (1945). Not only did she testify that she recognized her father's handwriting, Mrs. Storms testified that she recognized the checks as being the ones shown to her before the trial by law enforcement officers. She further testified that she recognized the check dated 31 January 1978 in the amount of $300.00 as being one she found in her father's bank statement. The state also offered the testimony of Durward C. Matheny, supervisor of the Questioned Documents Section of the State Bureau of Investigation, concerning these same checks. Mr. Matheny testified that the signatures which appeared on the second group of checks which was shown to Mrs. Storms were not made by the same individual who made the signatures on the first group of checks which she identified on the stand. Therefore, we conclude that there was no abuse of discretion on the part of the trial judge in that there was a sufficient foundation laid.

Margie Lee Pittman, daughter of John Henry Lee and Record Lee, identified state's Exhibit Number Three as being a check payable to the Internal Revenue Service bearing her mother's signature. She identified it as being a check that she had written out for her mother and which her mother had signed in her presence the morning after John Henry Lee had been taken to the hospital. Mrs. Pittman also identified state's Exhibit Number Four, a check payable to Bo's Supermarket in the amount of $50.00, as not bearing the authentic signature of her mother. This was a sufficient foundation.

[9] Defendant contends that an improper foundation was laid for the experts who testified as to their opinions of the cause of death of Stewart Taylor, Dolly Taylor Edwards, John Henry Lee and Jennings Barfield. This contention has no merit. The evidence showed that each of the doctors who stated an opinion as to cause of death was a qualified pathologist and that his opinion was based on an autopsy performed on the victim.

The competency of a witness to testify as an expert is a matter addressed to the discretion of the trial court judge and will not be disturbed on appeal if there is evidence in the record to support his finding. *State v. Moore*, 245 N.C. 158, 95 S.E. 2d 548

(1956). The absence of an express finding in the record that the witness is qualified as an expert is no ground for challenging the ruling implicitly made by the judge in allowing the witness to testify. 1 Stansbury's North Carolina Evidence § 133 (Brandis Rev. 1973). If the record indicates that such a finding could have been made it will be assumed that the judge properly found the witness to be an expert, or that his competency was admitted, or that no question was raised in regard to his competency. *State v. Shaw*, 293 N.C. 616, 239 S.E. 2d 439 (1977); *State v. Cates*, 293 N.C. 462, 238 S.E. 2d 465 (1977); *State v. Mitchell*, 283 N.C. 462, 196 S.E. 2d 736 (1973). There is sufficient evidence in the record in this case to justify allowing the three doctors to state their opinions as experts as to the cause of the deaths of the individuals in question. There was no abuse of discretion.

[10] Defendant contends that the trial court erred in denying her motion to suppress the statements given by her to Officers Lovette and Parnell. This contention has no merit.

The content of these statements has been set forth previously in this opinion. In short, on 10 March 1978 defendant denied having anything to do with the death of Stewart Taylor. On 13 March 1978 she gave the officers four separate statements concerning the deaths of Stewart Taylor, John Henry Lee, Lillie McMillan Bullard, and Dolly Taylor Edwards. On *voir dire*, Deputy Sheriff Lovette testified on behalf of the state. According to Lovette, he and Deputy Sheriff Parnell talked with defendant on 10 March 1978 at the Robeson County Sheriff's Department. On that occasion defendant was given her *Miranda* warnings and indicated that she did not want a lawyer at that time. She told the officers that she was willing to talk with them. Officer Lovette further testified that she did not appear to be under the influence of anything. When defendant returned to the sheriff's department to talk with the officers again, she was given her *Miranda* warnings a second time. At that time she was accompanied by her son, Ronald Burke. The officer testified that at the second conference defendant did not appear to be under the influence of anything; that she was upset and crying; and that no promises or threats were made to her.

On *voir dire* defendant testified that on the morning of the second interview she had taken a quantity of drugs: two Sine-

quans, two Elavils, two Tylenol III, two Tranxenes, and three Valium, and that at no time was she given her *Miranda* warnings. She went on to say "He told me that if I would open up and tell everything it would be much easier on me." Ronald Burke took the stand during *voir dire* and testified that when he went to his mother to take her to the sheriff's office he found a pill container in her hand and that she was wobbly; that she was crying and upset when she talked with the officers; and that Officer Lovette told him that "It will be easier for her."

The judge then made findings of fact and conclusions of law which he entered in the record denying the motion to suppress.

G.S. 15A-977(f) requires a judge to make findings of fact and conclusions of law when there is a motion to suppress. Such findings of fact must include findings on the issue of voluntariness. When the evidence is conflicting, the findings of fact must be sufficient to provide a basis for the judge's ruling. *State v. Herndon*, 292 N.C. 424, 233 S.E. 2d 557 (1977); *State v. Riddick*, 291 N.C. 399, 230 S.E. 2d 506 (1976). The facts so found by the trial court judge are conclusive if they are supported by competent evidence. *State v. Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976); *State v. Thompson*, 287 N.C. 303, 214 S.E. 2d 742 (1975), *death sentence vacated*, 428 U.S. 908, 49 L.Ed. 2d 1213, 96 S.Ct. 3215 (1976). The trial judge found as facts that defendant's statements were voluntary and that no promises or threats were made to her. There is competent evidence in the record which supports those findings.

Defendant argues that it was error to receive her statements into evidence because her *Miranda* warnings were not repeated prior to the making of each statement. This argument is without merit.

Before defendant talked with Officers Lovette and Parnell for the first time on 10 March 1978, she was advised of her constitutional rights by Deputy Lovette. Defendant stated to the officers that she understood her rights and that she did not want a lawyer. At that time, she executed a written waiver of rights form. Before they began questioning the defendant again on 13 March 1978, the officers once more advised her of her rights. In response to the repeated warning, defendant stated that she did not want a lawyer and that she wanted to make a statement. A written waiver of rights form was then read to her and she sign-

ed it. After executing the waiver, defendant proceeded to make four separate statements to the officers concerning her involvement in the deaths of Stewart Taylor, John Henry Lee, Dolly Taylor Edwards, and Lillie McMillan Bullard. There was no repetition of *Miranda* warnings before each separate statement was taken.

Repetition of *Miranda* warnings is not required where no inordinate time elapses between interrogations, the subject matter remains the same and there is no evidence that anything occurred in the interval which would serve to dilute the effect of the first warning. *State v. Small,* 293 N.C. 646, 239 S.E. 2d 429 (1977); *State v. Cole,* 293 N.C. 328, 237 S.E. 2d 814 (1977); *State v. McZorn,* 288 N.C. 417, 219 S.E. 2d 201 (1975), *death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d 1210, 96 S.Ct. 3210 (1976). The need for a repetition of *Miranda* warnings must be determined by the totality of circumstances of each case. *State v. McZorn, supra.* Among the factors that are to be considered in making this determination are: The length of time between the giving of the first warnings and the subsequent interrogation; whether the warnings and the subsequent interrogation occurred in the same place or in different places; whether the warnings and the subsequent interrogation were conducted by the same or different officers; the extent to which the subsequent statement differed from any previous statements; and the apparent intellectual and emotional state of the suspect at the time of the interrogation. *State v. McZorn, supra.*

In the present case, there were two interrogations of defendant by Officers Lovette and Parnell. During the first interrogation defendant denied any involvement in the death of Stewart Taylor. Before the first interrogation began, defendant was given her *Miranda* warnings. These warnings were repeated before the second interrogation began. During the second interrogation, defendant made four separate statements in the space of a relatively short time. The interrogation took place in the same location where she was given her *Miranda* warnings. The interrogation was conducted by the same officers who advised her of her constitutional rights. The statements which she gave to the officers on 13 March differed from one another because they were each concerned with different incidents. While it is true that there was testimony on *voir dire* which tended to show that

defendant had consumed a large quantity of drugs on the morning of March 13, there is no evidence in the record which would suggest that at the time of the interrogation she was under the influence of any substance. That the defendant was crying and otherwise visibly upset at the time of questioning does not by itself prove that she was not sober or otherwise cognizant of what was happening.

[11] By her eleventh assignment of error, defendant contends that the trial court erred in not submitting the defense of insanity to the jury for its consideration. The assignment is without merit.

Defendant entered a plea of not guilty by reason of insanity in addition to a general plea of not guilty. The district attorney was given written notice of defendant's intention to rely upon this defense. Dr. Bob Rollins, a psychiatrist specializing in forensic psychiatry, examined defendant upon her referral to the Forensic Unit of Dorothea Dix State Hospital by the district court. Dr. Rollins testified that though defendant was uncooperative, he concluded that she was competent to stand trial and that she knew the difference between right and wrong. Nothing in his examination led Dr. Rollins to conclude that defendant suffered from any type of mental illness at the time she allegedly administered poison to Stewart Taylor.

Dr. A. Eugene Douglas, a psychiatrist, examined the defendant upon referral on order of Judge Hobgood. Dr. Douglas concurred in the findings and conclusions of Dr. Rollins. Testifying by way of deposition, Dr. Anthony Sainz declined to state an opinion on the sanity of defendant but did testify that in his opinion, defendant was competent to stand trial and knew the difference between right and wrong. Dr. Sainz went on to state that while there was no evidence of mental illness on the part of the defendant, she did have what he termed a passive-aggressive personality with her judgment being immaturely developed.

Defendant argues that she presented sufficient evidence tending to show mental illness and to raise the issue of whether she knew the nature and quality of her act or knew that it was wrong. We find this argument unpersuasive.

The test of insanity that is recognized in North Carolina is whether the accused at the time of the commission of the alleged

act was laboring under such defect of reason from disease or defect of the mind as to be incapable of knowing the nature and quality of the act or if he does know it was by reason of such defect of reason incapable of distinguishing right from wrong in relation to such act. *State v. Jones*, 293 N.C. 413, 238 S.E. 2d 482 (1977). Every person is presumed to be sane and possess a sufficient degree of reason to be responsible for his crimes. *State v. Hicks*, 269 N.C. 762, 153 S.E. 2d 488 (1967); *State v. Creech*, 229 N.C. 662, 51 S.E. 2d 348 (1949). The burden is on the defendant to prove the defense of insanity to the satisfaction of the jury. *State v. Caldwell*, 293 N.C. 336, 237 S.E. 2d 742 (1977), *cert. denied*, 434 U.S. 1075, 55 L.Ed. 2d 780, 98 S.Ct. 1264 (1978). A trial judge does not err in failing to place the issue of insanity before the jury where there is no evidence produced at trial that would tend to show that a defendant was insane at the time of the commission of the alleged offense. *State v. Vinson*, 287 N.C. 326, 215 S.E. 2d 60 (1975), *death sentence vacated*, 428 U.S. 902, 49 L.Ed. 2d 1206, 96 S.Ct. 3204 (1978); *State v. Melvin*, 219 N.C. 538, 14 S.E. 2d 528 (1941).

From the record in the present case, we conclude that the evidence was insufficient to require the trial judge to submit the issue of defendant's sanity to the jury. All three of the psychiatrists who testified concluded that defendant knew the difference between right and wrong. There was no evidence that she did not know the nature and quality of her acts.

[12] Defendant contends that the trial court erred in refusing to dismiss the charges against her, in denying her motion for a directed verdict, in denying her motion to set the verdict aside as being contrary to law and the weight of evidence, in denying her motion for a new trial and in denying her motion for a mistrial on the ground that the prosecutor's behavior amounted to misconduct. These contentions have no merit. There was sufficient evidence to take the case to the jury on the issue of defendant's guilt. Furthermore, the evidence adduced at trial was sufficient to uphold the verdict against a motion for a new trial as well as against a motion to set it aside as being contrary to law and against the weight of the evidence. As we have indicated above, we fail to find that any of the conduct on the part of the district attorney in the prosecution of this case amounted to misconduct.

### PHASE II—SENTENCE DETERMINATION

By her fifth assignment of error, defendant contends that the trial court erred in entering a judgment calling for the death penalty because the North Carolina statutes providing for capital punishment, G.S. § 15A-2000 et seq., are unconstitutional. We find no merit in this assignment.

Defendant argues that the statutes are unconstitutional for four reasons: (1) the death penalty amounts to cruel and unusual punishment which is barred by the Eighth and Fourteenth Amendments to the United States Constitution; (2) the sentencing procedure is mandatory in nature; (3) the aggravating and mitigating circumstances prescribed in the statute are too vague; and (4) the state ought to be required to prove that there are no mitigating circumstances before the death penalty may be imposed.

The benchmark by which the constitutionality of G.S. § 15A-2000 et seq. is to be judged is that provided by the landmark case of *Furman v. Georgia*, 408 U.S. 238, 33 L.Ed. 2d 346, 92 S.Ct. 2726 (1972), and its progeny. In *Furman*, the United States Supreme Court held that the Eighth and Fourteenth Amendments to the United States Constitution invalidate any scheme for the imposition of the death penalty when either the judge or jury is permitted to impose that sentence as a matter of unbridled discretion. *See Furman v. Georgia*, 408 U.S. at 253, 33 L.Ed. 2d at 357, 92 S.Ct. at 2734 (Douglas, J., concurring); *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19 (1973). Only two justices concluded that capital punishment is *per se* unconstitutional, Justices Brennan and Marshall. For Justices Douglas, Stewart and White, the issue in *Furman* turned on their concern that because of the uniqueness of the death penalty, it ought not to be imposed under sentencing procedures that create a substantial risk that it could be inflicted in an arbitrary and capricious manner.

Justice Stewart concluded that the death sentences examined by the court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual . . . the petitioners [in *Furman*] were among a capriciously selected random handful upon which the sentence of death has been imposed." *Furman v. Georgia*, 408 U.S. at 309, 310, 33 L.Ed. 2d at 390, 92 S.Ct.

at 2762 (Stewart, J., concurring). Justice White echoed these sentiments in finding that "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. at 313, 33 L.Ed 2d at 292, 92 S.Ct. at 2764 (White, J., concurring). Justice Douglas eloquently summarized the position of those justices who did not find capital punishment to be *per se* unconstitutional, of which he was one, in observing that ". . . we deal with a system of law and of justice that leaves to the uncontrolled discretion of judges or juries whether defendants committing these crimes should die or be imprisoned. Under these laws, no standards govern the selection of the penalty. People live or die, dependent upon the whim of one man or of 12." *Furman v. Georgia*, 408 U.S. at 253, 33 L.Ed. 2d at 357, 92 S.Ct. at 2734 (Douglas, J., concurring).

It is appropriate to look to the concurring opinions of these three justices in determining the precise holding of *Furman* in that their concurrences were based upon narrower grounds than those of Justices Brennan and Marshall. Therefore, since the unbridled discretion of judges and juries to impose the death penalty formed the core of the court's disposition of *Furman*, it remained for later cases to carve from the decision clear boundaries within which the imposition of capital punishment would be constitutional.

In the wake of the *Furman* decision, the legislatures of at least 35 states enacted new statutes which called for the imposition of the death penalty for specified crimes. These newly adopted statutes attempted to address the concerns expressed by the Supreme Court in *Furman* primarily by retaining the concept of discretionary power on the part of judges and juries to impose capital punishment but at the same time specifying factors to be weighed and procedures to be followed in exercising that discretion or by making the death penalty mandatory for specified crimes. In a set of cases decided on the same day, the Supreme Court upheld three statutory schemes which called for the death penalty to be imposed as a matter of guided discretion on the part of judges or juries. At the same time, the court declared unconstitutional North Carolina's statute which called for the mandatory imposition of the death penalty upon a finding that the defendant was guilty of one or more enumerated crimes.

The statutory formulas for imposing the death penalty of Georgia, Florida and Texas were upheld in *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *Proffitt v. Florida*, 428 U.S. 242, 49 L.Ed. 2d 913, 96 S.Ct. 2960 (1976); *Jurek v. Texas*, 428 U.S. 262, 49 L.Ed. 2d 929, 96 S.Ct. 2950 (1976). Though the statutes differed in their particulars, they shared a similar characteristic: each left the decision to impose the death penalty to the *guided* discretion of either the judge or the jury.

After the *Furman* decision, Georgia enacted a new statutory formula for imposing the death penalty. Ga. Code Ann. §§ 26-3102; 27-2503; 27-2534.1; 27-2537 (Supp. 1975). The Georgia statute interpreted in *Gregg* requires that there be a bifurcated trial. In the first stage of the proceeding, the capital defendant's guilt is determined in the traditional manner before a jury or a judge. In the second stage of the trial after there has been a finding of guilt, a hearing to determine sentence is conducted before whoever made the determination of guilt. At this hearing, the jury or the judge hears additional evidence in mitigation, aggravation, or extenuation of punishment. Evidence in aggravation is limited to that which the state makes known to the defendant before trial. Argument of counsel is permitted. In making a determination of sentence, there must be a weighing of any mitigating or aggravating circumstances authorized by law as well as ten specially enumerated aggravating circumstances enumerated in the statute. The death penalty may be imposed only if the jury or the judge finds at least one of the statutorily enumerated aggravating circumstances beyond a reasonable doubt. Evidence considered during the guilt phase of the trial may be considered during the sentencing phase without being resubmitted. *Eberheart v. State*, 232 Ga. 247, 206 S.E. 2d 12 (1974). The statute provides for a special expedited appeal to the Supreme Court of Georgia. The court is directed to consider any errors brought forward on appeal as well as whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the finding of the statutory aggravating circumstance, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the particular defendant.

The Florida statute approved in *Proffitt* is similar to that examined in *Gregg* in that it too mandates a bifurcated trial as well

as an expedited appeal to the Florida Supreme Court. Fla. Stat. Ann. § 921.141 (Supp. 1976-1977). It differs, however, in that it calls for the jury to make, by a majority vote, a recommendation to the judge as to the appropriate punishment. Its finding is only advisory because the actual sentence is determined by the judge. In making that determination, the judge is directed to weigh eight enumerated aggravating factors against seven mitigating factors. The statute further provides for an automatic review by the Florida Supreme Court. It differs from that of Georgia in that it does not require the court to conduct a specific type of review. It is apparent that the basic difference between the Florida scheme and the Georgia approach is that in Florida the sentence is determined by the trial judge rather than the jury.

The Texas system examined in *Jurek* requires that if a defendant is convicted of a capital offense, the trial court must then conduct a separate sentencing proceeding before the same jury that tried the issue of guilt. Tex. Crim. Proc. Code Ann. § 37.071 (Supp. 1975-1976). The procedure requires the jury to answer three questions in a proceeding that takes place subsequent to the return of a verdict finding a person guilty of one of the categories of murder specified in the statute. The questions the jury must answer are these:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

If the jury finds that the state has proven beyond a reasonable doubt that the answer to each of the questions is yes, then the death penalty is imposed. If the jury answers any one of the questions no, a sentence of life imprisonment is imposed. The law also provides for an expedited review by the Texas Court of Criminal Appeals. The Texas approach to the imposition of capital punish-

ment differs from that of Georgia in that there is no weighing, as such, of aggravating and mitigating factors. Instead, the jury must answer beyond a reasonable doubt in an affirmative manner each of the three questions submitted to it at the sentencing hearing. The Texas scheme differs from that of Florida in that the jury, rather than the judge, is the ultimate arbiter of punishment.

From the foregoing sketch, it is apparent that the North Carolina statutes dealing with capital punishment are most similar to those of Georgia examined in *Gregg* because of the role of the jury in weighing various aggravating and mitigating factors in a separate sentencing proceeding. Therefore, it is appropriate to analyze the constitutionality of G.S. 15A-2000 et seq. in light of the framework provided by the *Gregg* case. This analysis must not proceed in a vacuum. It must take into account the case of *Woodson v. North Carolina*, 428 U.S. 280, 49 L.Ed. 2d 944, 96 S.Ct. 2978 (1976), decided the same day as *Gregg*. In *Woodson*, the United States Supreme Court struck down as unconstitutional the North Carolina death penalty statute as it was then applied. After *Furman* this court held unconstitutional the provisions of the death penalty statute for first-degree murder, G.S. § 14-17, in the case of *State v. Waddell, supra.* This court held further that the provision of the statute that gave the jury the option of returning a verdict of guilty without capital punishment to be severable so that the statute survived as a mandatory death penalty statute. The General Assembly enacted in 1974 a new statute that was essentially unchanged from the old one except that it made the death penalty mandatory upon a finding of guilt. It was this statute that was before the United States Supreme Court in *Woodson*.

In delivering the decision of the court in *Woodson*, Justice Stewart identified three grounds upon which the court found the North Carolina statute to be constitutionally infirm. First, he observed that the mandatory death penalty statute for first-degree murder departed from contemporary standards respecting the imposition of punishment of death in that there was a rejection on the part of society of making death mandatory for certain crimes. Second, he commented that the imposition of a mandatory death penalty for first-degree murder did not respond to *Furman's* rejection of unbridled discretion in imposing the penalty of death. This he found by assuming that juries would weigh

the severity of the mandatory punishment in making a determination of guilt or innocence and would exercise unbridled discretion in deciding whether to convict of the capital crime at all. Third, he noted that the statute did not allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the death penalty was imposed upon him. Justice Stewart buttressed this argument by observing that because of the finality of capital punishment, it is qualitatively different from imprisonment for a term of years. Accordingly, he found that there needed to be a finding that death is the appropriate punishment in a specific case. Therefore, it is not enough to examine the constitutionality of the present death penalty statutes under *Gregg*. We must also look to *Woodson* in order to determine if the defects of the prior statute have been corrected.

[13] Defendant argues that the death penalty amounts to cruel and unusual punishment barred by the Eighth and Fourteenth Amendments to the United States Constitution. It is now settled that the death penalty is not invariably cruel and unusual punishment within the meaning of the Eighth Amendment. *Coker v. Georgia*, 433 U.S. 584, 53 L.Ed. 2d 982, 97 S.Ct. 2861 (1977); *Gregg v. Georgia, supra*. To pass scrutiny under the Eighth Amendment, a penalty must accord with the dignity of man which is the underlying concept of the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. at 173, 49 L.Ed. 2d at 874, 96 S.Ct. at 2925; *Trop v. Dulles*, 356 U.S. 86, 100, 2 L.Ed. 2d 630, 78 S.Ct. 590 (1958). At the very least, this means that the punishment must not be excessive. *Gregg v. Georgia*, 428 U.S. 173, 49 L.Ed. 2d 875, 96 S.Ct. at 2925. Whether a penalty is excessive must be determined in light of two considerations. First, a penalty may be excessive and unconstitutional if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the needless and purposeless imposition of pain and suffering. *Coker v. Georgia*, 433 U.S. at 592, 53 L.Ed. 2d at 989, 97 S.Ct. at 2865; *Gregg v. Georgia*, 428 U.S. at 173, 49 L.Ed. 2d 875, 96 S.Ct. at 2925. *See also Wilkerson v. Utah*, 99 U.S. 130, 136, 25 L.Ed. 345, 348 (1879) ("It is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty are forbidden by that amendment.") Second, the punishment inflicted must not be grossly out of proportion to the severity of the crime.

*Coker v. Georgia*, 433 U.S. at 592, 53 L.Ed. 2d at 989, 97 S.Ct. at 2865; *Trop v. Dulles*, 356 U.S. at 100, 2 L.Ed. 2d at 642, 78 S.Ct. at 598; *Weems v. United States*, 217 U.S. 349, 381, 54 L.Ed. 793, 804, 30 S.Ct. 544, 554-555 (1910). In weighing these considerations, courts must give attention to public attitudes concerning a particular penalty as deduced from history and precedent, legislative action, and the conduct of juries. *See Coker v. Georgia*, 433 U.S. at 592, 53 L.Ed. 2d at 989, 97 S.Ct. at 2866. In *Gregg*, the United States Supreme Court held that the death penalty for first-degree murder was neither the purposeless imposition of severe punishment nor a punishment grossly disproportionate to the severity of the crime. *Gregg v. Georgia*, 428 U.S. at 187, 49 L.Ed. 2d at 882, 96 S.Ct. at 2932. We are in agreement with that holding.

[14] Defendant argues that the North Carolina death penalty is mandatory in nature. It is at this point that we must consider G.S. § 15A-2000 et seq. in light of *Woodson v. North Carolina, supra*. It will be recalled that *Woodson* declared the mandatory death penalty North Carolina then imposed to be unconstitutional. There were three grounds upon which the finding of unconstitutionality was based. First, Justice Stewart noted that the mandatory death penalty departed from society's rejection of the practice of making capital punishment mandatory. Second, he observed that juries would weigh the severity of the penalty in making the determination of guilt or innocence. In short, they would exercise unbridled discretion in deciding whether to convict of the capital crime at all. Because of this, a mandatory death penalty does not adequately address the issues raised in *Furman*. Third, a mandatory death penalty does not allow for the particularized consideration of the relevant aspects of the character and record of each convicted defendant before the sentence of death is imposed upon him. To carry her argument that the present death penalty statutes are mandatory in nature, defendant must establish that the infirmities of the old statute which were identified in *Woodson* have not been corrected. We are not persuaded that the present statutes provide for the *mandatory* imposition of the death penalty.

The apparent simplicity of the manner in which the prior statute operated was its constitutional downfall. Under former practice, a defendant who was found guilty of first-degree murder was invariably sentenced to death. Sentence would be pronounced

without an examination of the particular facts and circumstances relating to the commission of the crime or to the defendant. Insofar as sentencing was concerned, the law was blind in its operation and application. However, mindful of the mandatory sentence which attached upon a conviction of first-degree murder, juries were free to exercise wide latitude over the sentence to be imposed by their conduct at the guilt determination stage of the trial. This conduct was not subject to any guidance or structure of any kind except for the instructions which the trial court judge gave to the jury before they retired to deliberate. Therefore, at one and the same time, a mandatory death penalty allows two distinct constitutional infirmities to have free play even though they are polar opposites to one another. Juries are allowed to have too much discretion in their determination of defendant's guilt; while at the sentencing phase of the proceeding there is no discretion to be exercised whatsoever. We conclude that the present North Carolina death penalty statutes overcome the problems identified in *Woodson.*

First, the determination of guilt is entirely divorced from the imposition of punishment. Though the same jury that made the determination of guilt may make the determination of punishment, it makes that determination at a different time, subject to a different set of instructions from the trial judge. Therefore, the issue of jury nullification of the instructions of the court by refusing to convict of the capital offense is diffused. In making the finding of guilt or innocence, the jury now does not invariably weigh the probable punishment. In addition, the evidence that it considers in the punishment phase of trial is not necessarily the same as that it dealt with in finding the defendant guilty. Though it may consider evidence previously introduced at the guilt determination stage, it is not limited to that evidence. Additional evidence in mitigation as well as aggravation may be introduced. Additional argument of counsel is permitted. In short, the nature of the bifurcated trial itself serves to prevent the issue of probable punishment from bleeding over into the determination of guilt or innocence. In so providing, the present North Carolina death penalty statutes recognize not only what Justice Stewart perceived to be society's rejection of the mandatory imposition of the death penalty but also the actual conduct of juries in weighing the guilt or innocence of the accused.

Second, while the present statutes serve to diffuse the issue of jury discretion in the process of guilt determination, they also provide for the exercise of *guided* discretion at the sentencing stage of the proceeding. After hearing the evidence, arguments of counsel, and further instructions of the trial court judge, the jury is required to deliberate and render a binding sentence recommendation to the court. This recommendation is not presented until the jury has engaged in a two-step process. Initially, the jury must determine which of the aggravating and mitigating circumstances exist on the basis of the evidence presented. If it finds that none of the statutory aggravating circumstances exist beyond a reasonable doubt, the inquiry is at an end and the defendant is sentenced to life imprisonment. If, however, the jury finds that any of the statutory aggravating circumstances exist, it must determine whether they outweigh any mitigating circumstances in a sufficiently substantial manner so as to call for the imposition of the death penalty. It is this process that overcomes the problem spotlighted in *Woodson*: a mandatory death penalty does not allow for the particularized consideration of the relevant aspects of the character and record of a convicted defendant. Furthermore, a mandatory death penalty does not allow the singular characteristics of the conduct found to be criminal to be weighed in the balance in the imposition of sentence as is invariably done in the finding of guilt.

While there is discretion at this stage of the process, it is not discretion that is constitutionally forbidden. It is discretion which is guided by the very language of the statute and the process by which it is implemented. Prior to *State v. Waddell, supra,* juries had uncontrolled discretion as to the punishment to be imposed in a capital case. A jury then had the power to sentence a convicted capital defendant to life imprisonment by so recommending at the time it rendered its verdict. While it is true that the present statute empowers the jury in effect to impose sentence upon the defendant, that decision is not made blindly. No defendant may be sentenced to death unless and until the jury finds at least one statutory aggravating circumstance to exist beyond a reasonable doubt which outweighs any mitigating circumstance in a sufficiently substantial manner so as to call for the death penalty. No aggravating circumstance which is not provided by the language of the statute may be considered by the jury in imposing sen-

tence. G.S. 15A-2000(e). In this respect, our statute is significantly more narrow than the statute which was upheld in *Gregg*. The Georgia death penalty statute which was at issue in that case allowed a jury to consider "any . . . aggravating circumstances otherwise authorized by law and any of [10] statutory aggravating circumstances which may be supported by the evidence. . . ." Ga. Code Ann. § 27-2534.1(b) (Supp. 1975). It is apparent that juries operating under the Georgia procedure have *greater discretion* in imposing the death penalty than do juries in North Carolina. While the present North Carolina statute enumerates several mitigating factors to be considered by the jury, it does not limit the jury in its consideration of mitigating factors. A North Carolina jury is specifically empowered to consider "[A]ny other circumstance arising from the evidence which the jury deems to have mitigating value." In short, while the jury's discretion to impose the death penalty is sharply limited, it retains wide discretion to consider the particular circumstances of the defendant and his conduct so that the punishment which is ultimately imposed is not grossly disproportionate to the crime.

It is clear from the foregoing discussion that the present North Carolina death penalty statutes are not mandatory in nature but instead provide for the exercise of guided discretion in the imposition of sentence.

[15] Defendant further argues that the North Carolina death penalty statutes are unconstitutional because they fail to give to the jury objective standards to guide it in weighing aggravating against mitigating circumstances in passing upon the issue of sentence. In particular, defendant contends that the aggravating circumstances are vague and without accurate definition. Intertwined with that contention is the further argument that the jury is given no guidance in how it is to go about determining whether the mitigating circumstances are insufficient to outweigh the aggravating circumstances found. Defendant's argument is not persuasive.

As a general proposition, a jury is not likely to be skilled as a body in handling the information which is brought before it on the issue of punishment. *See Gregg v. Georgia*, 428 U.S. at 192, 49 L.Ed. 2d at 885, 96 S.Ct. at 2934. However, the jury's inexperience in digesting the information presented to it can be over-

come if it is given sufficient guidance regarding the relevant factors about the defendant and the crime he was found to have committed. *Id.* Appropriate sentencing standards operate to reduce the risk that the death penalty will be imposed in an arbitrary or capricious manner. In the words of Justice Stewart, "[I]t is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." *Gregg v. Georgia,* 428 U.S. at 193, 49 L.Ed. 2d 886, 96 S.Ct. at 2934. Appropriately framed and submitted sentencing standards allow a jury to consider on the basis of all the relevant evidence not only why the death sentence should be imposed but also why it should not be imposed. *Jurek v. Texas,* 428 U.S. at 271, 49 L.Ed. 2d at 938, 96 S.Ct. at 2956.

Sentencing standards are by necessity somewhat general. While they must be particular enough to afford fair warning to a defendant of the probable penalty which would attach upon a finding of guilt, they must also be general enough to allow the courts to respond to the various mutations of conduct which society has judged to warrant the application of the criminal sanction. *See Gregg v. Georgia,* 428 U.S. at 194-195, 49 L.Ed. 2d at 886-887, 96 S.Ct. at 2935. While the questions which these sentencing standards require juries to answer are difficult, they do not require the jury to do substantially more than is ordinarily required of a factfinder in any lawsuit. *See Proffitt v. Florida,* 428 U.S. at 257-258, 49 L.Ed. 2d at 926, 96 S.Ct. at 2969. The issues which are posed to a jury at the sentencing phase of North Carolina's bifurcated proceeding have a common sense core of meaning. Jurors who are sitting in a criminal trial ought to be capable of understanding them and applying them when they are given appropriate instructions by the trial court judge. *See Jurek v. Texas,* 428 U.S. at 279, 49 L.Ed. 2d at 939, 96 S.Ct. at 2959 (White, J., concurring).

[16] Defendant's attack upon the constitutionality of the present North Carolina death penalty statutes concludes with the assertion that due process of law requires the state to bear the burden of proof that in a given case no mitigating circumstances exist. We find no merit in this argument.

Due process requires the state to bear the burden of proving beyond a reasonable doubt each element of a substantive criminal offense. *Hankerson v. North Carolina,* 432 U.S. 233, 53 L.Ed. 2d

306, 97 S.Ct. 2339 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 44 L.Ed. 2d 508, 95 S.Ct. 1881 (1975); *In Re Winship*, 397 U.S. 358, 25 L.Ed. 2d 368, 90 S.Ct. 1068 (1970). However, the concept of due process does not require that a state must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses which are related to the culpability of an accused. *Patterson v. New York*, 432 U.S. 197, 53 L.Ed. 2d 281, 97 S.Ct. 2319 (1977). Nor does due process require a state to disprove beyond a reasonable doubt the existence of a factor which mitigates the degree of criminality or punishment. *See Cole v. Stevenson*, 447 F. Supp. 1268 (E.D.N.C. 1978).

In light of the foregoing discussion, we hold that the North Carolina death penalty is constitutional.

Although defendant has not brought forward and argued to this court any assignment of error which relates to the submission of a particular aggravating circumstance to the jury, in view of the penalty that has been imposed, we have carefully considered those that were submitted. We conclude that the trial court did not err in this respect. *See State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979).

＊　＊　＊　＊　＊.　＊

As a check against the capricious or random imposition of the death penalty, this court is empowered to review the record in a capital case to determine whether the record supports the jury's findings of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. G.S. 15A-2000(d)(2).

We do not take lightly the responsibility imposed on us by G.S. 15A-2000(d)(2). We have combed the record before us. We have carefully considered the briefs and arguments which have been presented to us. We conclude that there is sufficient evidence in the record to support the jury's findings as to the aggravating circumstances which were submitted to it. We find nothing in the record which would suggest that the sentence of death was imposed under the influence of passion, prejudice, or

any other arbitrary factor. The manner in which death was inflicted and the way in which defendant conducted herself after she administered the poison to Taylor leads us to conclude that the sentence of death is not excessive or disproportionate considering both the crime and the defendant. We, therefore, decline to exercise our statutory discretion to set aside the sentence imposed.

No error.

Justice BROCK took no part in the consideration or decision of this case.